UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 13-10237-RGS

UNITED STATES OF AMERICA

v.

LANCE SMITH

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS

January 16, 2015

STEARNS, D.J.

Defendant Lance Smith, who is charged with being a felon in possession of a firearm, moves to suppress the weapon, which was seized by Boston Police in the mid-morning of May 8, 2013, on the premises of the Mary Ellen McCormack Housing Development (Project) in South Boston. An evidentiary hearing was held on July 2, 2014, and thereafter, at counsel's request, several extensions were granted to permit the filing of supplemental briefing pending the availability of the hearing transcript. Final argument on the motion was heard by the court on November 4, 2014.

Based on the credible testimony and exhibits offered into evidence, I find the following material facts.

1. On the morning of May 8, 2013, Officer Stephen Horne, a Boston

Police veteran of (at the time) nineteen years, and his partner Officer Brendan Kelly, were on uniformed patrol in the area of the Project in South Boston. Dkt. #48-Tr. at 88, 91 & 118. The officers were aware of an armed bank robbery that had occurred nearby the preceding day, the perpetrators of which had fled into the Project, and one of whom was still at large. *Id.* at 90 & 117-118. The officers also knew of firearms and other arrests that had been made in and around the Project. *Id.* at 90 & 117. As the officers traveled through Sterling Square, they observed defendant Lance Smith, then unknown to them, retrieving an object from the trunk of a green Honda parked on O'Callaghan Way. *Id.* at 95-96 & 121. A young woman, later identified as Rhonda Zablocki (Smith's girlfriend and the owner of the Honda), was slumped down in the driver's seat. *Id.* at 95. The officers had seen the Honda parked in the same location an hour or so earlier with the same woman in the car by herself. *Id.* at 94-95 & 119. At the first encounter, the officers had run the plate of the Honda and learned that it was it was registered to an address in the nearby suburb of Weymouth. *Id.* at 95 & 119.

2. The officers observed Smith retrieve an object from the trunk and thrust it into his right sweatpants packet. *Id.* at 96 & 121. Although Smith appeared to be looking to his left and right while he did so, he did not see the cruiser. *Id.* at 96-97 & 121. He then began walking quickly down O'Callahan Way without speaking or gesturing to Zablocki. *Id.* at 97 & 122. The officers

followed with Kelly driving.[1]  *Id.* at 123.  At no time did the officers activate the cruiser's lights or siren.  *Id.* at 100 & 123.  As the officers pulled abreast of Smith, he appeared momentarily shocked.  Horne asked, "Excuse me, you mind if I talk to you?"  *Id.* at 100.  Smith ignored the request and continued walking.  *Id.* at 101.  Horne persisted and asked who owned the car that Smith had exited.  He replied, "It's my girlfriend's car.  Go talk to her."  *Id.* at 133.  Horne exited the cruiser and approached Smith, asking him for his name.  *Id.* at 101-102 & 124.  Smith gave his true name, standing stiffly with his right side turned away from Horne.  *Id.* at 102 & 124.  Suspicious, Horne asked Smith if "he had anything on him the officers should be aware of."  *Id.* at 103.  Smith did not reply, but began backing up.  As he did so, Horne observed a bulge in Smith's right pocket.  *Id.*  Horne grabbed the pocket and felt what he believed to be the frame of a gun.  *Id.* at 104.  Smith batted Horne's hand away and began running in the opposite direction towards Kemp Street.  *Id.* at 105 & 134.  Horne shouted to Kelly, "Gun."  *Id.* at 106 & 124.  Horne unholstered his service weapon.  *Id.* at 106.  Kelly yelled to Smith, "Stop.  Drop the gun."  *Id.* at 125.  In response, Smith took the gun from his pocket and threw it to the pavement, along with a cell phone.  *Id.* at 108 & 126.  Kelly tackled Smith as he continued to run and placed him under arrest.  *Id.* at 127.  The gun was seized from where Smith had thrown it.  *Id.*

---

[1] The officers were driving against the traffic on O'Callaghan Way, which is a one-way street.  The parties debate the import of this fact at some length, although I accord it no particular significance.

at 109.

## RULINGS OF LAW

1. Not every encounter between police and citizens rises to the level of a stop or seizure. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968). Whether a citizen's liberty has been "restrained" by police for Fourth Amendment purposes depends on whether a reasonable person in similar circumstances would feel free to leave or otherwise "disregard the questions and walk away." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). *Cf. California v. Hodari D.*, 499 U.S. 621, 628 (1991) (The *Terry-Mendenhall* test "states a *necessary*, but not a *sufficient,* condition for seizure" — there must also be a physical restraint or a submission to an assertion of authority).

2. Police officers "do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer*,

460 U.S. 491, 497 (1983) (*plurality opinion*); see also *United States v. Drayton*, 536 U.S. 194, 200-201 (2002) (police require no level of prior suspicion to pose questions to persons in public places and ask for their identification); *United States v. Young*, 105 F.3d 1, 6 (1st Cir. 1997) (holding that a police encounter that began with the question, "Got a minute [to talk?]" did not trigger the protection of the Fourth Amendment.); *United States v. Angell*, 11 F.3d 806, 809 (8th Cir. 1993) (same for the statement, "Stay there, I want to talk to you."); *Commonwealth v. Martin*, 467 Mass. 291, 303 (2014) (finding no seizure when an officer called out, "Hold up or stop, we want to speak with you or words to that effect."); *Commonwealth v. Rock*, 429 Mass. 609, 611-612 (1999) (no seizure when an officer, who had followed two running suspects, asked, "Guys, can I talk to you for a second?"); *Commonwealth v. Lopez*, 451 Mass. 608, 609 (2008) (no seizure when an officer beckoned from his cruiser to a cyclist asking, "Can I speak with you?"); *Commonwealth v. Stoute*, 422 Mass. 782, 789 (1996) (no *Terry*-type stop when an officer asked defendant and his companion to "hold up for a minute.").

3. Citizens have no legal duty to cooperate with police inquiries. "The person approached . . . need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. . . . He

may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Royer*, 460 U.S. at 497-498 (*citations omitted*); s*ee also Florida v. Bostick*, 501 U.S. 429, 437 (1991).

    4. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams*, 407 U.S. 143, 145-146 (1972) (citing *Terry*, 392 U.S. at 21-23). In order for such a stop to be constitutional, "the police officer's action [must] be based on specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience." *Commonwealth v. Silva*, 366 Mass. 402, 406 (1974). "Based upon [the] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-418 (1981). A threshold inquiry is initiated by a stop; the resulting detention, however brief, is a seizure within the meaning of the Fourth Amendment.

*Terry*, 392 U.S. at 16-19.

     5.  The test distinguishing a seizure from a consensual encounter is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *Mendenhall*, 446 U.S. at 554, or otherwise terminate the encounter. *Bostick*, 501 U.S. at 436. An officer may follow or closely watch a suspect on a hunch without violating any constitutional right of the accused; an ensuing pursuit, unaccompanied by any application of physical force is not a "seizure" for purposes of the Fourth Amendment. *Hodari D.*, 499 U.S. at 626. Moreover, a *show* of authority by itself does not transform a pursuit into a Fourth Amendment seizure. "The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. . . . It does not remotely apply, however, to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. . . . [A seizure] requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *Id.*; *see also Ludwig v. Anderson*, 54 F.3d 465, 471 (8th Cir. 1995) ("[A] seizure occurs when *either* the citizen submits to an assertion of authority *or* physical force is applied, regardless of whether the citizen yields to that force.").

6. A combination of suggestive circumstances, largely innocent in and of themselves, when considered in their totality, may constitute the "reasonable suspicion" necessary to justify a *Terry* stop. *United States v. Sokolow*, 490 U.S. 1, 9 (1989). Suggestive circumstances often weighed by reviewing courts include furtive gestures or activity, *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984); obvious attempts to evade officers, *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975); suspicious presence in a high crime area, *United States v. Trullo*, 809 F.2d 108, 111-112 (1st Cir. 1987); knowledge of a suspect's reputation, *United States v. Am*, 564 F.3d 25, 30 (1st Cir. 2009); proximity to the scene of a recent crime; *United States v. Aldridge*, 719 F.2d 368, 371 (11th Cir. 1983); and knowledge peculiar to an officer's training and experience, *United States v. Arvizu*, 534 U.S. 266, 276 (2002).

7. Where "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous . . . and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt

to discover weapons which might be used to assault him." *Terry*, 392 U.S. at 30. Both of the *Terry* conditions, reasonable suspicion of a criminal offense and reasonable suspicion that the person stopped is armed and dangerous must be met. *Arizona v. Johnson*, 555 U.S. 323, 326-327 (2009). "The purpose of this limited [*Terry*] search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 146 (1972). "Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons." *Ybarra v. Illinois*, 444 U.S. 85, 93-94 (1979). If police have no reasonable grounds to believe that a suspect is armed or dangerous, a frisk is improper. *Id.* at 92-93.

## CONCLUSIONS OF FACT AND LAW

1. Officer Horne's non-coercive initial encounter with Smith and his request for Smith's name and efforts to engage him in conversation were permissible and authorized by law.

2. Smith's initial refusal to respond to Horne's questions and his attempts to continue on his way without stopping were permissible and authorized by law.

3. Almost none of the traditional indicia of articulable suspicion were present. (a) Smith was unknown to the officers. (b) The hour was

mid-morning.  (c) Events unfolded on a public street and sidewalk in an environs (the Project), which, while a locus of criminal activity, was not regarded as a notorious high crime area.  (d) There is nothing innately suspicious about a young woman sitting in the driver's seat in a legally parked car in a residential neighborhood who is joined an hour later by a young man.  (e)  There is nothing innately suspicious about a man removing an object from the trunk of a car with the implicit permission of its driver.  (f) There is nothing innately suspicious about a bulge in a man's pants pocket. (g) There is nothing innately suspicious about a person being startled at the sudden appearance of a police officer at his side.  (h)  The officers were on routine patrol and not responding to a report of a recent crime in the vicinity. (i) When Smith did speak with Officer Horne, nothing that he said was demonstrably untrue or evasive.  (j)  Smith made no menacing or furtive gestures (other than standing in a bladed pose that Horne thought stiff and awkward).

    4.  In sum, while Horne, as an experienced officer, had a well-honed hunch that the object that Smith had thrust in his pocket was a gun, he did not have a sufficient articulable basis for conducting a *Terry* stop or undertaking a frisk of Smith's person.

5. Horne's physical contact with Smith and the grabbing of his pocket constituted a seizure within the meaning of the Fourth Amendment.

6. Prior to the First Circuit's panel decision in *United States v. Camacho*, 661 F.3d 718 (1st Cir. 2011), Smith's subsequent physical resistance to the frisk and his attempt to flee from an arrest would have been deemed an intervening act breaking the chain of causation, thereby dissipating any taint created by the illegal detention. *See United States v. Bailey*, 691 F.2d 1009, 1016-1017 (11th Cir. 1983) (*en banc*) (resistance to an even unlawful arrest provides sufficient and independent grounds for a second arrest for a new and distinct crime); *United States v. Sprinkler*, 106 F.3d 613, 619 (4th Cir. 1997) (same); *United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995) (same); *United States v. Garcia*, 516 F.2d 318, 319-320 (9th Cir. 1975) (although stop was illegal, suspect's subsequent flight supported probable cause for arrest); *United States v. Sheppard*, 901 F.2d 1230, 1234-1236 (5th Cir. 1990) (evidence not suppressed when, after an alleged Fourth Amendment violation, suspect consented to search of vehicle but then fled); *Commonwealth v. King*, 389 Mass. 233, 245 (1983) (driver's

intervening action of attacking officers dissipated the taint of an unlawful seizure).[2]

7. The *Camacho* decision is (to my mind) wrongly decided and inconsistent with prior First Circuit precedent, as Judge Boudin pointed out in his vigorous dissent. *See United States v. King,* 724 F.2d 253, 256 (1st Cir. 1984) (police were shot at during an allegedly illegal search; court held that the shooting "was an independent intervening act which purged the taint of the prior illegality."). Nonetheless, where panel decisions of the Court of Appeals conflict, my understanding is that the most recent panel decision, in this case *Camacho*, is binding on the district court.

8. There are no sufficient distinctions in the relevant facts that would differentiate this case from *Camacho*.[3]

---

[2] Prior to *Camacho*, Smith's act during flight of throwing the gun to the pavement might also have been deemed an act of abandonment breaking the chain of causation. *See Hodari D.*, 499 at 629 (fleeing suspect was not actually seized, thus "tossed" a rock of cocaine was considered to be abandoned); *United States v. Sealey*, 30 F.3d 7, 10 (1st Cir. 1994) (same except that the abandoned evidence was a weapon and ammunition).

[3] "Under the totality of these circumstances, we agree with the district court that the initial stop of Camacho 'cannot be justified under the principles of *Terry.*' [*United States v. Camacho,* 608 F. Supp. 2d 178, 184 (D. Mass. 2009)]. The police officers lacked an objectively reasonable, particularized basis for suspecting Camacho of criminal activity. *See Ornelas* [*v. United States,* 517 U.S. 690, 696 (1996)]. None of the police officers at the scene recognized Camacho or Osario-Meléndez or had reason

## ORDER

For the foregoing reasons, the motion to suppress the firearm is ALLOWED.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

to believe that they were affiliated with the Latin Kings. *Camacho,* 608 F. Supp. 2d at 184. No one had identified Camacho or Osario-Meléndez, or men fitting their descriptions, as combatants in the brawl. *Id.* 'The men were walking normally on a residential sidewalk and displayed no apprehension or nervousness when the officers approached,' and Camacho's responses to Sousa's questions 'were direct and non-evasive.' *Id.* As for 'specific and articulable facts' that could have formed the basis for an officer's reasonable suspicion, *see* [*United States v. Hensley,* 469 U.S. 221, 229 (1985)], '[t]he most that can be said is that the two men were observed in a high crime area walking away from the vicinity of a street fight that one caller reported as involving Latin Kings.' *Camacho*, 608 F. Supp. 2d at 184." *Camacho*, 661 F.3d at 726-727.